# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RON E. EVERSOLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:08-cv-1137-TWP-MJD |
| | ) | |
| SPURLINO MATERIALS OF | ) | |
| INDIANAPOLIS, LLC, and JAMES | ) | |
| SPURLINO, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants', Spurlino Materials, LLC ("Spurlino Materials") and James Spurlino ("Spurlino") (collectively, "Defendants"), Motion for Summary Judgment. This dispute stems from an array of allegations made by Plaintiff Ron Eversole ("Eversole") against his former employer. Eversole's causes of action include race discrimination, retaliation, hostile work environment, negligent retention, and defamation.[1] For the reasons set forth below, Defendants' Motion for Summary Judgment (Dkt. 103) is **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND

The following background section is not necessarily true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Plaintiff as the non-movant. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

---

[1] Eversole's complaint also stated a claim for negligent hiring. However, by failing to respond to Defendants' arguments, Eversole effectively conceded the day on this count.

## A.        Spurlino Materials' Operations

Spurlino owns Spurlino Materials, a ready-mix concrete company formed in late 2005. Numerous Spurlino Materials employees are significant to this dispute. Specifically, Spurlino hired Gary Matney ("Matney") in November 2005 to be the General Manager of the company's Indianapolis operation and Jeff Davidson ("Davidson") to be the Operations Manager. In his capacity as Operations Manager, Davidson had discretion to make hiring and firing decisions. Eversole, an African-American male, worked as a truck driver for Spurlino Materials. George Gaskin ("Gaskin") supervised all drivers and served as their point person when problems arose.

## B.        The Union Campaign

Soon after beginning his employment with the company, Eversole, along with Matt Bales ("Bales") and Gary Stevenson ("Stevenson"), both Caucasians, contacted Teamsters Local Union No. 716 ("Local 716") to kick-start a union organizing campaign. Matney recognized that Eversole was the driving force behind this movement. On this point, Eversole testified, "If I decided to vote yes for union, they [his fellow drivers] were voting yes for the union…Gary Matney knew that." Through both written materials and individual conversations, Spurlino Materials attempted to discourage organizing efforts by communicating that a union was unnecessary and would not be beneficial. The union campaign fomented considerable tension between the company and its drivers. On this point, Eversole testified that the unionization drive created a "super hostile" work environment. Eversole felt that the company blamed him, in particular, for the unionization efforts.

On numerous occasions, Matney tried to dissuade Eversole from continuing his campaign. Eversole testified that "sometimes [Matney] would get on my fender with smart

remarks about the union, smart remarks about the jobs we could have if we wasn't in the union, conversations about what we're giving up if we go union, [and] what Jim Spurlino was going to offer us." In the end, however, Matney's attempts at persuasion proved futile. On January 13, 2006, the drivers voted in favor of unionization and, ten days later, Local 716 was certified as the collective bargaining representative of the drivers. After the vote, Matney insisted that the drivers had a made a bad decision. Matney told Eversole "how we made a mistake, how we're screwed now because we voted in the union, how we would never get anything we wanted because we voted in the union." After the vote, the parties commenced collective bargaining negotiations. To this day, the parties have failed to hammer out an agreement.

## C.     New Trucks and the Lucas Oil Stadium Project

In early February 2006, Spurlino Materials purchased several new trucks, three of which were provided to drivers at the plant where Eversole worked. According to Defendants, Davidson and Gaskin selected the recipients by weighing multiple variables (but not seniority). Ultimately, Davidson assigned trucks to Ken Cox ("Cox"), Eric Kiefer ("Kiefer"), and Terry Mooney ("Mooney") – all Caucasians. During his deposition, Eversole testified that he did not receive a new truck because of the "union situation." When asked if there were any other reasons, Eversole testified, "At that time, no."

On May 12, 2006, Spurlino Materials notified its drivers that it was establishing a portable batch plant onsite at Lucas Oil Stadium. Beginning in June 2006, drivers would be assigned to work there. This project paid over $21.00 per hour, compared to a driver's normal hourly rate of $17.50. A total of 13 drivers expressed interest in reassignment, including Eversole. On the basis of a "multi-factor analysis," Davidson and Gaskin settled on four drivers for reassignment –

Mooney, Kiefer, Wayne Thomerson, and John Pinatiello (all Caucasians). Eversole had more seniority than all of the selected drivers. However, the very next month, Spurlino Materials offered Eversole the opportunity to take the reassignment, but Eversole declined.

Although reassignment offered first access to the Lucas Oil Stadium project, the work was insufficient to keep the four drivers assigned to the portable batch plant 100% of the time. Therefore, when there was insufficient work at the project, they were placed at the bottom of the dispatch list at their permanent plants. Additionally, on many occasions, there was too much work for only four drivers to handle. In these instances, Spurlino Materials dispatched additional drivers, including Eversole, to the project.

## D.      Eversole's Eye Injury

On July 19, 2006, Eversole got hydraulic fluid in his eye and on his contact lens when his truck's hydraulic line broke. Eversole attempted to wash out his eye using the hose on the jobsite, but the water was "nasty," so he drove to Spurlino Materials' nearest plant in Linden, Indiana. There, Eversole washed his eye out at a wash station, the local batch operator asked him if he was okay, and Eversole responded "yes."

Roughly two days later, Eversole reported the incident to Matney and asked him for a worker's compensation form. Matney responded that he would have to check with Gaskin. Eversole had several more conversations with Matney, all equally futile. Eversole testified that Matney always responded that "he would still have to talk to somebody and he still believed I waited too long…." Weeks later, Eversole sought a form from Gaskin, who eventually provided him with one on August 17, 2006 – almost one month after the initial accident. After giving Eversole the form, Gaskin sent him to a worker's compensation-approved doctor and Spurlino

Materials filed a worker's compensation claim with its insurer. After initially denying the claim, the insurer eventually accepted it and paid for Eversole's office visits. Significantly, Eversole did not miss any compensable time from work due to his eye injury.

**E.      Unfair Labor Practices Case**

On August 9, 2006, Local 716 filed unfair labor practice charges, alleging (among other things) that Spurlino Materials discriminated against bargaining unit employees Eversole, Stevenson, and Bales by not selecting them as drivers to the portable batch plant. Eversole was not an actual party to these proceedings.

On April 27, 2007, Administrative Law Judge Ira Sandron presided over a hearing. There, Cox testified that just after the union election, he had a conversation with Matney, in which Matney stated that he knew Eversole was the ringleader of the unionization effort and that Eversole "feels that he's owed something from everybody and that's why he's done this." Disturbingly, Matney also called Eversole a "nigger." Cox told Eversole about this conversation, but did not disclose it to anyone else prior to the April 27, 2007 hearing. Immediately after Cox's testimony, Spurlino Materials purportedly began investigating Cox's allegations.

On December 17, 2007, ALJ Sandron issued a decision, holding that Spurlino Materials' refusal to assign Eversole, Bales, and Stevenson to the portable batch plant at the Lucas Oil Stadium project was unlawfully based on their union activities. In doing so, ALJ Sandron found that Davidson was not credible with respect to his reasons for not giving Eversole the Lucas Oil Stadium job. Spurlino Materials was ordered to make Eversole and the others whole.

**F.    Matney's Other Remarks, Spurlino Materials' Policies, and Eversole's Discrimination Charge**

Assuming the truth of Eversole's allegations, Matney spewed venomous, racially-charged language with regularity.[2]  In addition to the comments described above, Matney purportedly told Cox that Eversole "was the type of person who was mad about the end of slavery" and that if Eversole tries to use his race he has "another thing coming."  Matney also told Cox that there was only one problem in the union situation and "that problem is a nigger."  Further, Matney told Bales – Eversole's best friend – that Eversole thought he was "owed something because of slavery" and that he was glad Bales did not think like "African American, colored people."  Matney allegedly made a similar noxious comment to Stevenson.  In addition, Matney even boasted to Stevenson that "[a]fter I get done with Ron Eversole he'll quit his job."  Matney, however, never made any racial remarks directly to Eversole; rather, Eversole learned about them through third parties.

Not surprisingly, Matney's alleged comments ran contrary to Spurlino Materials' stated policies.  According to its policies, Spurlino Materials is an equal opportunity employer with published policies against discrimination.  Further, at some point, Spurlino Materials had a harassment policy posted at its facility.  The policy notwithstanding, Eversole never notified any of his supervisors, such as Gaskin, Davidson, or Spurlino, about any inappropriate conduct.

On September 19, 2006, Eversole filed a charge of discrimination with the Indiana Civil Rights Commission ("ICRC").  On April 17, 2008, the ICRC issued a written Notice of Finding declaring the probable cause existed to believe that Spurlino Materials engaged in unlawful

---

[2]It is worth noting that Matney left Spurlino Materials in the first half of 2009.

discriminatory practices against Eversole. The ICRC Finding concluded that "[b]ased on the evidence in the investigative record, this matter requires an administrative proceeding" because "a reasonable person might conclude unlawful employment practices occurred in violation of the Indiana Civil Rights Law." On August 25, 2008, Eversole filed the present lawsuit with this Court.

**G.     The May Memorandum**

In April 2009, the drivers rejected Spurlino Materials' latest collective bargaining agreement offer. In response, Spurlino drafted a memorandum dated April 8, 2009 and distributed it to employees in May 2009 ("May Memorandum"). The May Memorandum sought to resolve questions about the negotiations and the financial status of the company. But it also took a swipe at Eversole. In relevant parts, the May Memorandum reads:

> I have been in management of concrete companies my entire life. I have always had friendly and productive relationships with all the employees that have worked for me. We have always paid good wages and benefits and treated everyone fairly. All the employees at our other operations have enjoyed their work lives and shared in bonuses and profit-sharing. In fact, many of our employees living in Ohio, Indiana, and Kentucky have earned "Loyalty" bonuses of $10,000 upon reaching 5 years employment with us. This is because they worked hard and helped make the company successful and profitable. <u>The same cannot be said of some of the employees in Indianapolis.</u> <u>Most are good hardworking people but a few can change the whole environment.</u> <u>Negative statements and actions make for unpleasant and less productive workplaces.</u> <u>I believe this has contributed to us not being able to have a contract agreed to and our lack of profitability</u>. The financial aspects are troubling:
>
> • We have lost over $1 million in each of the last 2 years.
>
> • We have spent over $550,000 in consultant and attorney fee dealings with the Teamsters. This is money not available for wages, benefits, trucks, etc.
>
> • <u>We have spent over $10,000 so far defending a lawsuit brought by Ron Eversole who never reported anything to management but nevertheless filed a lawsuit and continues to cost us money to defend</u>.

7

We simply cannot continue to run such an unprofitable company. We made our last offer that would have allowed the company, we believe; to stay in business, yet hold the line on losing even more money. The alternative of shutting down the Indianapolis operations may make sense, especially given the economic problems we have faced, but we've put too much into making a go of it in this market to just give up now. It would be unfortunate since many of the current Indianapolis employees would not find work, at least not in the depressed concrete industry or at their current wages.

(Emphasis added). During his deposition, Spurlino testified that he had no evidence as to whether or not Eversole was a "good person" or a "hardworking person," or if Eversole ever behaved in a way that caused the workplace to be "unpleasant or a less productive environment."

## H.     Eversole's Discharge

On April 6, 2010, Eversole's relationship with Spurlino Materials reached a breaking point. While training a new driver, Eversole attempted a 90 degree turn and he rolled his cement mixer truck. The new driver, Edmond Brown, noted that Eversole took the turn too fast. And after the accident, Eversole allegedly told Davidson, "Yeah, I may have been going too fast." Initially, Eversole was suspended and given a drug test, which came back negative.

According to Eversole, Davidson initially told him that he would not be fired. Apparently, Davidson subsequently had a change of heart. On April 13, 2010, Davidson called Eversole at home and fired him, even though this was Eversole's first accident. Additional facts are added below as needed.

## II.  <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## III. DISCUSSION

As mentioned above, Eversole brought an array of claims against Spurlino Materials, including race discrimination, racially hostile work environment, retaliation, and negligent retention. Eversole also brought a claim of defamation against Spurlino individually. Each cause of action is addressed in turn below.

### A. Race Discrimination

As an initial matter, Eversole is pursuing race discrimination claims under both Title VII and 42 U.S.C. § 1981 ("Section 1981"). These claims, although brought under different statutes,

are functionally identical.  Therefore, the same analysis will apply. *See Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

### 1.    General principles

It is well-established that a plaintiff may prove discrimination in one of two ways: either through direct evidence, or indirectly through the burden shifting mechanism of *McDonnell Douglas*. *Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000) (citation omitted). A review of each is instructive.

Under the direct method, a plaintiff may proffer direct or circumstantial evidence to prove discrimination.  Direct evidence establishes "the fact in question without reliance on inference or presumption." *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (citation omitted).  Eversole concedes that he does not have any "smoking gun" direct evidence, which is not surprising, given that such evidence is rare.  After all, even the most heedless employer is unlikely to make such overt and damning admissions.  Nonetheless, a plaintiff can still prevail under the direct method by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decision maker." *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citation omitted).

Alternatively, a plaintiff can use the indirect method of proof, which consists of three steps: (1) Eversole must establish a *prima facie* case of discrimination based on race, (2) if he does so, the burden shifts to Spurlino Materials to provide a legitimate, non-discriminatory reason for the adverse action, and (3) Eversole must then come forward and show the stated reason is pretextual. *See Henderson*, 207 F.3d at 376.  Eversole points to numerous adverse employment

actions relevant to his race discrimination claim.  The Court's analysis will begin with his discharge.

### 2.      Eversole's April 2010 discharge

Eversole uses the indirect method of proof in an attempt to show that his discharge was motivated by race.  To establish a *prima facie* case of race discrimination, Eversole must show that (1) he was a member of a protected class; (2) he was meeting his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. *Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 530 (7th Cir. 2003) (citations omitted).  "To defeat summary judgment on the *prima facie* case, [plaintiff] need only demonstrate that there is a genuine issue of material fact regarding these factors." *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir. 1999).

With respect to his discharge, Eversole indisputably meets elements (1) and (3).  Elements (2) and (4), by contrast, are hotly contested.  Thus, in determining whether Eversole established a *prima facie* case, the Court only needs to consider whether he was meeting legitimate expectations and whether similarly situated non-Black employees received more favorable treatment.   Spurlino Materials argues that Eversole's claim fails under both prongs.  That is, Eversole cannot show he was meeting legitimate expectations because he rolled his truck with a trainee in the vehicle, causing significant damage.  In turn, Eversole cannot point to any similarly situated individuals because no one besides Eversole has ever flipped a concrete truck.

The Seventh Circuit has stated that where a plaintiff broke a rule but was disciplined more harshly than similarly situated employees outside of the plaintiff's protected class, "it makes little sense…to determine whether [plaintiff] was meeting [the employer's] legitimate expectations.

Rather, [the employer's] argument is more appropriately considered in our analysis of pretext." *Curry v. Menard, Inc.*, 270 F.3d 473, 478 (7th Cir. 2001) (citation omitted); *see also Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002) ("When a plaintiff produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of *McDonnell Douglas* merge, allowing the plaintiff to establish a prima facie case by establishing that similarly situated employees were treated more favorably.") (citations omitted).  Here, Eversole alleges that Spurlino Materials meted out punishment in an uneven manner.  Under the circumstances, the Court believes it is appropriate to merge the second and fourth prongs of Eversole's *prima facie* case.

The Court turns to the last element of the *prima facie* case to assess if Eversole can show that he was treated differently than similarly situated employees not in his protected class. "Whether two employees are 'similarly situated' is a common sense inquiry that depends on the employment context." *Filar v. Board of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008) (citation omitted).  Similarly situated employees must be directly comparable in "all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (citation omitted).  Relevant factors for making this determination include "whether the employees dealt with the same supervisor and were subject to the same standards." *Id.* (citations and internal quotations omitted).  To prove this element, Eversole must demonstrate that the comparators occupied the same job level and engaged in similar misconduct but were nonetheless subject to more favorable disciplinary action for no legitimate reason. *See Jordan v. City of Gary, Ind.*, 396 F.3d 825, 834 (7th Cir. 2005); *See also Filar*, 526 F.3d at 1061 ("All things being equal, if an

employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination.").

Here, Eversole meets the similarly situated element. Many of his Caucasian coworkers had been in work accidents involving vehicles. None were punished, let alone discharged. For instance, Eversole can compare himself to coworkers Bales (at least two accidents with other drivers, and a fellow cohort in the unionization effort), Wayne Thomerson (multiple accidents), Dan Shaw (at fault in at least two accidents), and Jason Mahaney (at least three accidents).[3]

Spurlino Materials counters that Eversole's accident was unprecedented, in terms of severity and the fact that he was riding with a trainee. Even so, to make a showing of being similarly situated, "a plaintiff need not present a doppelganger who differs only by having remained in the employer's good graces." *Filar*, 526 F.3d at 1061. The differences in the severity of the accidents notwithstanding, the Court believes that Eversole is similarly situated to the Spurlino Materials' drivers who have also been in accidents; the comparisons are not "incomplete or arbitrary," as was argued by Defendants. Spurlino Materials had a long history of forgiving its drivers – just not Eversole. Drawing all reasonable inferences in Eversole's favor, the Court finds that Eversole has satisfied the similarly situated element. Accordingly, Eversole can make out a *prima facie* case.

---

[3]Throughout their briefing, the parties quarreled about whether Eversole was similarly situated to Brent Shelton ("Shelton"). Specifically, Eversole argued that Shelton was a Spurlino Materials employee who had been at fault in two serious accidents causing significant damage, yet was not fired or disciplined. Spurlino Materials countered that Shelton "is not an employee of Spurlino Materials…is not supervised by anyone at Spurlino Materials…does not regularly drive a mixer truck for Spurlino Materials, and he has not trained any driver at Spurlino Materials." On March 29, 2011, Eversole filed a Motion for Leave (Dkt. 117), so that he could supplement his evidentiary materials based upon newly discovered evidence arguably suggesting that Shelton should be considered an employee of Spurlino Materials. Given the nature of the Court's ruling, it need not address this issue in detail. Suffice to say, adding Shelton to the mix would only reinforce the Court's decision.

In response, Spurlino Materials offered a legitimate non-discriminatory reason for Eversole's discharge: namely, he was involved in an accident where he flipped his truck, resulting in significant expenses to the company. In accord with the *McDonnell Douglas* paradigm, the burden now shifts to Eversole to show that this explanation is pretextual. "Pretext means a dishonest explanation, a lie rather than an oddity or an error." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and internal quotations omitted). For pretext determinations, the Court's only concern "is the honesty of the employer's explanation." *Id.* at 984 (citation and internal quotations omitted). Thus, the Court must analyze whether or not Spurlino Materials' proffered explanation is a lie to cover up unlawful retaliation.

Here, although Spurlino Materials did not have a formal policy in place for disciplining drivers involved in accidents, it had a history of granting them clemency. An employer's departure from its own policies and procedures may create a genuine issue of material fact as to pretext. *See Rudin v. Lincoln Land Community College.*, 420 F.3d 712, 727 (7th Cir. 2005) (citation omitted). Moreover, after the accident, Davidson informed Eversole he would not be terminated, telling him "there might be some type of discipline, but you will not be terminated and lose your job." Further, Davidson stated, "[i]f I was going to terminate you, it would be done already by now." By Davidson's own account, the decision to fire Eversole was his alone. This makes his drastic change in heart especially puzzling. Such curious shifting also raises the specter of pretext.

Given Spurlino Materials' mixed signals and arguably inconsistent application of disciplinary policy, coupled with drawing all reasonable inferences in favor of Eversole, the Court

finds that genuine issues of material fact exist. For the reasons set out above, summary judgment is not warranted on Eversole's Title VII race discrimination claim.

### 3. Other employment actions relevant to Eversole's discrimination claim

This does not conclude the Court's analysis of Eversole's race discrimination claim. Eversole also highlights four other alleged racially-motivated employment actions that occurred prior to his discharge: (1) Eversole's failure to receive a new truck in 2006, (2) Spurlino Materials' delayed and lacking response to his eye injury in 2006, (3) Matney's opposition to union membership, and (4) Eversole's denial of a promotion to the Lucas Oil Stadium project in 2006. Eversole utilizes the direct method of proof using circumstantial evidence for these pre-discharge actions.

However, the Court need not engage in an exhaustive analysis, given that none of the above rise to the level of a materially adverse employment action. In order to recover for a discrimination claim, a plaintiff must show that he has suffered a material adverse employment action. The Seventh Circuit has recognized three categories of adverse employment actions:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing [him] from using [his] skills and experience, so that the skills are likely to atrophy and [his] career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of [his] present job altered, but the conditions in which [he] works are changed in a way that subjects [him] to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [his] workplace environment.

*Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009) (citation omitted). Of course, not all unpleasant actions are materially adverse. *See, e.g., Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) (unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, are not materially adverse); *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 654 (7th Cir. 2000) (denial of bonus is not materially adverse). As the *Hunt* court recognized, "The idea behind requiring proof of an adverse employment action is simply that a statute which forbids *employment* discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace." *Id.* at 653 (collecting cases; emphasis in original).

Here, none of the pre-discharge employment actions are materially adverse. First, courts throughout the country have routinely held that actions like failing to receive a new truck do not constitute adverse employment actions for purposes of Title VII.[4] *See, e.g., Rhodes v. Ill. Dept. of Transp.*, 243 F. Supp. 2d 810, 818-19 (N.D. Ill. 2003) ("Rhodes cannot claim that…being denied the privilege of driving the Lead Worker's truck…amounted to an adverse employment action."); *Hamilton v. Century Concrete, Inc.*, 2007 WL 2010938, at *6 (D. Kan. July 9, 2007) ("failing to receive a new truck for use on the job does not constitute an adverse employment action"); *Tinkle v. Oklahoma Gas & Elec.*, 16 Fed. Appx. 815, 817 (10th Cir. 2001) (employer's denial of truck assignment request did not constitute necessary adverse employment action).

Second, Spurlino Materials' alleged dilatory response to Eversole's eye injury is not materially adverse. Eversole alleges that the lag between his request for worker's compensation forms and actually receiving the form delayed his treatment, ultimately forcing him to see a

---

[4]In his response brief, Eversole attempts to tether the receipt of a new truck to higher pay. But this is really just the Lucas Oil Stadium reassignment argument, discussed below, recast in a different form.

doctor and buy a pair of glasses on his own. The Court agrees that Spurlino Materials' response to Eversole's injury was troubling. Nonetheless, a troubling or unpleasant act does not equate to being a material adverse employment action under Title VII. This position is reinforced by district court decisions within the Seventh Circuit. *See Craig v. Lyons Workspace Products, LLC*, 2005 WL 1027131, at *4 (N.D. Ill. April 22, 2005) (failure of employer to submit a timely incident report and a delay in receiving treatment were insufficient to establish an adverse employment action); *King v. Principi*, 2002 WL 31163666, at *3 (N.D. Ill. Sept. 27, 2002) (employer's failure to assist employee in filing worker's compensation claims fails to rise to the level of an adverse employment action); *see also McGuire v. U.S. Postal Service*, 749 F. Supp. 1275, 1282 (S.D.N.Y. 1990) (employer's nine-day delay in supplying requested form so that plaintiff could report injury did not constitute an adverse employment action for purposes of Title VII). Eversole does not address these cases in his briefing, instead relying exclusively on *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336 (S.D.N.Y. 2006). But *Hill* is readily distinguishable. There, the employer refused to allow the plaintiff to return to work for two months, effectively cutting her annual pay by 16%. *Id.* at 355. Eversole, by contrast, lost no compensable time at all.

Third, Eversole makes a somewhat amorphous allegation that Matney discriminated against Eversole by harshly opposing his right to join a union by using racial slurs in front of third parties and pressuring Caucasian drivers to distance themselves from Eversole.[5] Presumably, this is a matter suited for the National Labor Relations Board ("NLRB"). *See* 29 U.S.C. § 158. Simply stated, discouraging an employee from joining a union is not a materially adverse employment action under Title VII.

---

[5] Eversole appears to have raised this argument for the first time in his response brief.

Finally, Eversole claims that his denial of a promotion to the Lucas Oil Stadium project in 2006 constitutes an adverse employment action. Ostensibly, this argument appears strong, given that the Lucas Oil Stadium project job paid above Eversole's normal hourly rate. Moreover, Eversole testified that compared to Mooney, he lost up to $10,000.00 by not being assigned to the Lucas Oil Stadium project. Nonetheless, upon closer review, the Court is not persuaded. Eversole's estimate of a $10,000.00 loss appears to be based only on his own speculation. *Truhlar v. U.S. Postal Service*, 600 F.3d 888, 893 (7th Cir. 2010) (speculation is insufficient to overcome a motion for summary judgment); *Neal v. Indiana Gaming Company, L.P.*, 2009 WL 5219020, at *9 (S.D. Ind. Dec. 31, 2009) ("Ms. Neal has produced no evidence of this incident apart from her own assertions, which is insufficient to create a genuine issue of material fact."); *Roney v. Ill. Dept. of Transp.*, 376 F. Supp. 2d 857, 867 (N.D. Ill. 2005) ("Roney's allegations of being denied overtime work…is principally based on his vague, speculative and unfounded allegations.").

Further, the evidence suggests that the hourly rate paid at the Lucas Oil Stadium project did not automatically translate into higher overall wages because work on the project was sometimes insufficient to keep workers busy. During these lulls, drivers assigned to the project were placed on the bottom of the regular dispatch list.[6] Cox turned down the reassignment after initially applying because "I didn't want to lose my position that I already have." Most tellingly, in July 2006, just one month after employees started working at the Lucas Oil Stadium project, Eversole also turned down the reassignment position when it was offered to him. Thus, common

---

[6] Interestingly, the NLRB Findings stated that from May 1, 2006 to June 9, 2006 – essentially the month before Eversole turned down the reassignment – he worked 61 hours at the stadium. Only one driver worked more than Eversole, and that driver worked 62 hours.

sense suggests that the portable batch location was more akin to a lateral transfer than a real promotion.[7]

Accordingly, Eversole cannot base a claim for disparate treatment discrimination on any pre-discharge employment actions.[8]  Regardless, Eversole's race discrimination claim based on discharge survives summary judgment.  Therefore, Defendants' Motion as to Eversole's race discrimination claim is **DENIED**.

## B.    Retaliation

For his retaliation claim brought under Section 1981,[9] Eversole does not clearly articulate if he is proceeding under the direct or indirect method of proof.  For purposes of the present decision, the Court will assume that he is using the direct method.  Under this method, the plaintiff must present evidence, direct or circumstantial, demonstrating that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the two. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662-63 (7th Cir. 2006).  Eversole engaged in protected activity when he filed his 2006 charge of discrimination and his 2008 race discrimination suit.  Eversole then relies on two employment actions to buttress his retaliation claim.

---

[7]Because he was ultimately offered the position, Eversole's reassignment was, in effect, *delayed*, not altogether *denied*.  *See, e.g., Fair v. Norris*, 480 F.3d 865, 868-70 (8th Cir. 2007) (no adverse employment action when, due to employer's error, there was a delay in employee's promotion, which she ultimately declined).

[8]The Court believes that, given the nature of its ruling, it need not directly address the parties' collateral estoppel arguments at this time.

[9]Eversole effectively abandoned his Title VII retaliation claim in his response brief.  But for purposes of the present motion, this fact is academic, as Title VII and Section 1981 claims are analyzed under the same rubric. *See, e.g., Antonetti v. Abbott Laboratories*, 563 F.3d 587, 591 n.4 (7th Cir. 2009).

First, Eversole argues that the May Memorandum, described above, constitutes an adverse employment action.  The Court is not persuaded.  Eversole failed to show that the May Memorandum significantly altered the terms or conditions of his job.  Rather, at worst, the May Memo was effectively an unfair reprimand. *See, e.g., Griffin v. Potter*, 356 F.3d 824 (7th Cir. 2009) (rejecting retaliation claim where a supervisor made negative statements about the plaintiff in staff meetings – such as, she was a "bad influence on the office" – after the plaintiff filed discrimination charges); *see also Grube*, 257 F.3d at 728 (altered work hours, negative performance evaluations, or unfair reprimands, by themselves, do not constitute adverse employment action).  Moreover, while the May Memorandum was certainly not designed to endear Eversole to his coworkers, there is no evidence that Spurlino Materials ordered that Eversole be shunned.  For this reason, the key Seventh Circuit case relied on by Eversole is inapposite. *McKenzie v. Ill. Dep't. of Transp.*, 92 F.3d 473, 485 (7th Cir. 1996) ("It would seem that, under the proper circumstances, an employee who orders other employees not to talk to a Title VII claimant could indeed retaliate against that claimant by, in effect, ordering others to shun her.").[10]

Eversole's discharge, however, is a different story.  Obviously, termination constitutes an adverse employment action.  Thus, if Eversole can show a causal connection between the termination and his statutorily protected activity, he will survive summary judgment.

Spurlino Materials argues that too much time passed between Eversole's protected activity and his discharge, thus extinguishing any conceivable causal connection.  Indeed, the Seventh Circuit has found that, in some instances, relatively short lags between the protected

---

[10]Eversole also argues that Spurlino Materials also retaliated against him by creating "an even more hostile environment."  However, this argument is just another iteration of his May Memorandum argument.

activity and the adverse action can negate causality. *See, e.g., Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 398-99 (7th Cir. 1999) (four months severed causal inference); *Davidson v. Midelfort Clinic*, 133 F.3d 499, 511 (7th Cir. 1998) (five months). Spurlino Materials deduces that if a causal inference is severed after four or five months, then it must be severed after multiple years.

This argument has some appeal, but the Court is not persuaded. Here, additional facts raise a cloud of suspicion over the legitimacy of Eversole's discharge. Under such circumstances, courts need not robotically adhere to rigid temporal proximity rules. *See McKenzie*, 92 F.3d at 485 (long periods do not negate causality under suspicious circumstances). As described above in the race discrimination analysis, Eversole was treated far worse than his counterparts who had not engaged in statutorily protected activity. Moreover, the May Memorandum – while not, by itself, an adverse employment action – shows that Eversole's lawsuit was at the front and center of Spurlino's mind as late as April 2009. Drawing all reasonable inferences in Eversole's favor, it is not difficult to imagine that Spurlino Materials patiently waited in the weeds to retaliate against Eversole, and that his wreck gave it the opportunity to strike while the iron was hot. *See Veprinsky v. Fluor Daniel, Inc.,* 87 F.3d 881, 891 n.6 (7th Cir. 1996) (long lapses in time not fatal if there is proof of a causal link). For this reason, the Court finds that Eversole's retaliation claims are compelling. Defendants' Motion for Summary Judgment as to retaliation is **DENIED**.

C.      **Racially Hostile Work Environment**

To survive summary judgment on a hostile work environment claim, Eversole must show (1) his work environment was objectively and subjectively offensive; (2) the harassment was based on race; (3) the conduct was severe or pervasive; and (4) there is a basis for Spurlino

Materials' liability. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). The threshold for the a plaintiff is high; "the workplace that is actionable is one that is hellish." *Perryv. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) (citation and internal quotations omitted).

Here, Eversole highlights many vile comments made by Matney to third parties, who then relayed these comments to Eversole. These comments were overtly racist and/or pertained to Matney's desire to make Eversole quit. However, Eversole admitted that Matney never actually made such comments directly to him. Courts have routinely held that racial comments not made directly to the plaintiff, while disgusting, are not actionable under Title VII. *See, e.g., Ngeunjuntr v. Metropolitan Life Ins. Co.,* 146 F.3d 464, 467 (7th Cir. 1998) (rejecting plaintiff's hostile work environment claim even though, along with comments made directly to the plaintiff, the employer warned coworkers not to trust the plaintiff because he was of the "yellow race" and a Buddhist); *Whittaker v. Northern Illinois Univ*., 424 F.3d 640, 642 (7th Cir. 2005) ("Because most of the offensive comments giving rise to the plaintiff's claim were made outside of her presence and unbeknownst to her and because those that were directed at her were relatively isolated, we affirm the grant of summary judgment in the defendants' favor on her hostile work environment claim); *Cain v. Elgin, Joliet & Eastern Ry. Co.*, 2006 WL 163010, at *12 (N.D. Ind. Jan. 19, 2006) (granting employer summary judgment motion because six of the seven race-based comments made by the plaintiff's supervisor were made outside the plaintiff's presence and relayed to the plaintiff by coworkers); *Walls v. Turano Baking Co.*, 221 F. Supp. 2d 924, 929 (N.D. Ill. 2002) (summary judgment granted even when plaintiff heard third party conversation using the word "nigger" and supervisor used nonracial abusive language; "[i]solated comments made by a supervisor to employees other than plaintiff and outside the plaintiff's presence, while

offensive, are not actionable as harassment under Title VII.") (citation omitted); *Maldonado v. Invensys Bldg.*, 157 Fed. Appx. 904, 906 (7th Cir. 2005) (affirming summary judgment in favor of employer when race-related comments made by supervisor and co-workers were generally not addressed to the plaintiff, who overheard or was told about the comments and when supervisor made only a single direct racial comment to the plaintiff).

Eversole's remaining allegations relate to his direct interaction with Matney.  In relevant part, Eversole testified as follows:

> [M]ost of my conversations held by Gary Matney were conversations trying to convince me of why I shouldn't vote the union in, sometimes he would get on my fender with smart remarks about the union, smart remarks about the jobs we could have if we wasn't in the union, conversations about what we're giving up if we go union, what Jim Spurlino was going to offer us, how we made a mistake, how we're screwed now because we voted in the union, how we would never get anything we wanted because we voted in the union. . . the sight of Gary Matney despised me so if I did not have to have conversations with Gary Matney, I preferred not to.

Further, Stevenson testified that Matney often jumped on the fender of Eversole's truck and started "chewing him out for no reason."  Bales echoes this in an affidavit, stating "I personally witnessed  [Matney] berate [Eversole] on a regular basis in front of all drivers…Gary Matney did not treat any of the other Spurlino Materials drivers in this way."  However, Bales also admitted that although he visibly observed these incidents, he usually was unable to hear the substance of the conversations.

Unquestionably, Matney treated Eversole badly to his face.  But in these instances, Matney's actions were squarely focused on union activity, which makes sense, given that Matney indisputably considered Eversole to be the ringleader of the unionization efforts. *See Walls*, 221 F. Supp. 2d at 930 (recognizing that behavior must have a *racial* character or purpose to support a Title VII claim; non-racial abusive language, coupled with use of racial slur, did not create a hostile work environment under the circumstances).  Moreover, the key case relied on by

23

Eversole is easily distinguishable. *See Pettis v. R.R. Donnelley & Sons Co.*, 2008 WL 2717745, at *7 (S.D. Ind. July 11, 2008) (highlighting that plaintiff was called a "black bastard" and a "black motherfucker" directly to his face). At bottom, the Court finds that Eversole did not sufficiently allege an actionable racially hostile work environment. Therefore, summary judgment is **GRANTED** on the claim of racially hostile work environment.

**D.    Defamation**

Eversole's defamation action against Spurlino is based solely on the May Memorandum, which stated in part, "We have spent over $10,000 so far defending a lawsuit brought by Ron Eversole who never reported anything to management but nevertheless filed a lawsuit and continues to cost us money to defend." The May Memorandum also implied that some Indianapolis employees were not hardworking or pleasant, stating: "Most [employees] are good hardworking people but a few can change the whole environment. Negative statements and actions make for unpleasant and less productive workplaces. I believe this has contributed to us not being able to have a contract agreed to and our lack of profitability."

Significantly, true statements never give rise to liability for defamation. *Northern Indiana Public Service Co. v. Dabagia*, 721 N.E.2d 294, 301 (Ind. Ct. App. 1999) (citation omitted). Here, the first statement specifically directed at Eversole is true. In his deposition, Eversole admitted that Spurlino Materials was spending money on his lawsuit and that he never reported any instances of discrimination directly to management. The fact that the company may have ultimately learned about the allegations through other channels is irrelevant. The portion of the May Memorandum alluding to the fact that some workers have made the workplace unpleasant does not even refer to Eversole. Instead, it only makes vague, unverifiable statements of opinion, which cannot amount to actionable defamation. *See Filippo v. Lee Publications, Inc.*,

485 F. Supp. 2d 969, 980 (N.D. Ind. 2007) (defamatory statements are only those "which contain a provable fact, not subjective conclusions. . ."); *Rambo v. Cohen*, 587 N.E.2d 140, 147-48 (Ind. Ct. App. 1992) (*abrogated on other grounds*) (commenting about several cases holding defamation claims to be deficient, including calling the employee a "deadbeat and a crook," a "stupid son of a bitch," a "big fat oaf," and a "damn liar."). For these reasons, summary judgment is **GRANTED** on the defamation claim and James Spurlino as an individual, is terminated from this case.

## E.     Negligent Retention

Eversole's negligent retention claim is based on Spurlino Materials' failure to discharge Matney after acquiring knowledge of his penchant for racism.[11] The elements of a negligent retention claim in Indiana require Eversole to show: (1) a duty of care owed by an employer to a third person; (2) breach of that duty; and (3) injury to the third person proximately caused by the employer's breach. *Gingerich v. City of Elkhart Probation Dept.*, 2011 WL 556798, at *4 (N.D. Ind. Feb. 8, 2011) (citation omitted).

One key fact is fatal to Eversole's negligent retention claim: the last contact Eversole had with Matney in a work environment was prior to August 17, 2006 and Eversole "felt better" once his contact with Matney ceased. However, Eversole did not file this action until August 25, 2008. Because Matney's last contact with Eversole occurred more than two years before Eversole filed his negligent retention lawsuit, his claim is time-barred. *See Sullen v. Midwest ISO*, 2005 WL 4889257, at *5 (S.D. Ind. July 27, 2005) (two-year statute of limitations applies to negligent hiring; dismissing claim because it was filed more than two years after the alleged

---

[11]Eversole admits that his negligent retention "is largely, if not wholly, overlapped by [his] race discrimination claim." (Dkt. 107 at 52).

harasser had been hired); *Hansen v. Board of Trustees of Hamilton Southeastern School Corp.*, 551 F.3d 599, 609 (7th Cir. 2008) (recognizing that negligent hiring, supervision, and retention are the same species of tort). In other words, Eversole cannot show that he filed suit within two years of being harmed by any negligent retention of Matney. Summary judgment is **GRANTED** on the negligent retention claim.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion for Summary Judgment (Dkt. 103) is **GRANTED** in part and **DENIED** in part. Plaintiff's causes of action for a racially hostile work environment, defamation, and negligent retention are dismissed. However, Plaintiff's claims for race discrimination and retaliation as to his discharge will proceed. Additionally, Defendant James Spurlino, individually, is hereby terminated from the case.

SO ORDERED: 04/07/2011


Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Lynn M. Eriks
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
leriks@scopelitis.com

Alvin Jackson Finklea , III
SCOPELITIS GARVIN LIGHT & HANSON
jfinklea@scopelitis.com,bleive@scopelitis.com

James H. Hanson
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
jhanson@scopelitis.com,bleive@scopelitis.com

Tamika Lynn Henderson
tamikalhenderson@hotmail.com

Robert F. Hunt
HUNT HASSLER & LORENZ LLP
hunt@huntlawfirm.net,dshell@huntlawfirm.net

Caitlin M King
HUNT, HASSLER & LORENZ
king@huntlawfirm.net,caitlinking5@gmail.com

Robert Peter Kondras , Jr
HUNT HASSLER & LORENZ LLP
kondras@huntlawfirm.net,autumn@huntlawfirm.net